**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 24, 2016**

# In the Court of Appeals of Georgia

A15A2090. RZI PROPERTIES, LLC v. SOUTHERN REO BO-103
   ASSOCIATES, LLC.

BOGGS, Judge.

The buyer, RZI Properties, LLC ("RZI"), sued a brokerage firm, Southern REO

Associates, LLC ("REO"), after SunTrust Mortgage, Inc. rejected its offer to purchase

a parcel of real property.[1] The trial court granted REO's motion for summary

judgment, concluding that there is no evidence that it breached any duty to perform

ministerial acts with reasonable care. Because an issue of fact remains regarding

REO's exercise of reasonable care in the performance of its duties, we reverse.

"Summary judgment is proper when the record reveals no genuine issues of

material fact and the moving party is entitled to judgment as a matter of law. OCGA

---

[1]RZI also sued SunTrust Mortgage, Inc., but later dismissed the suit without
prejudice.

§ 9-11-56 (c). We review the trial court's grant of summary judgment de novo, construing the evidence and all reasonable inferences in favor of the nonmoving party." (Citation and punctuation omitted.) *Swanstrom v. Wells Fargo Bank*, 325 Ga. App. 743 (754 SE2d 786) (2014).

Construed in favor of RZI, the evidence showed that RZI desired to purchase property owned by SunTrust Mortgage ("the seller"). RZI's principal member, Ehsan Razavi, asked Phetfamone Senesombath ("Pat"), a broker with REO, to broker the deal. RZI owned other, contiguous lots and desired to purchase this fourth lot to create an assemblage. RZI and Pat entered into a verbal agreement, and Razavi informed her that she would receive a commission of approximately $1,500 "for performing the simple tasks related to the closing." His instructions to her were "to perform or provide all necessary paperwork as requested by the Seller[,] . . . to promptly notify [him] if anything was needed from [him], and to timely notify [him] of any and all communications from the Seller."

After some negotiation, in early January 2012, RZI submitted an offer to purchase the property. The events that occurred thereafter are as follows:

January 4     The seller's listing broker sent Pat an email ("the preferred form for offers") with "BANK ADDENDUMS FOR MEMORIAL DRIVE LOT

2

#2" in the subject line, and noting that "ALL OFFERS ARE SUBJECT TO FINAL CORPORATE APPROVAL." The email listed a purchase price of $5,000, requested that RZI provide a complete package of information within 24 hours that included a purchase and sales agreement with certain terms, a copy of the earnest money check made out to the seller's closing attorney, and an "[u]pdated proof of funds within the last 30 days." The email also instructed that the earnest money check be mailed to a particular address within 48 hours. Pat forwarded this email to Razavi within an hour of receiving it (and Razavi acknowledged that he did in fact receive it ), adding a message to him that, "[w]e have accepted contract for $5,000. Please read below and let me know. Thanks!"

January 6   Razavi provided Pat with the packet of information requested by the seller's broker, but the proof of funds he included was not dated within the past 30 days. Pat nevertheless submitted the packet of information to the seller's broker the same day.

January 10   Between January 10 and January 12, several emails were exchanged between Pat and the seller's broker regarding receipt of the earnest

3

money. Pat apparently sent the earnest money to the closing attorney instead of the seller's broker as directed.

January 12    The seller's broker sent Pat an email message at 4:08 p.m.: "Contract was rejected because the proof of funds is over 30 days old. Please send updated proof of funds and the seller is now requesting an extension to the close date to 02/24/2012. I need this back by 10:00 am!!" Pat forwarded this email to Razavi the same day with the instruction to "Please read below." Razavi deposed that he did not receive this email from Pat until midday on January 13, and that he contacted Pat to inquire "as to what was going on because I thought we had a contract. Consequently, I believed there was no need for an updated proof of funds." He told Pat that he would provide an updated proof of funds on Tuesday, January 17, 2012 (Monday, January 16, was a holiday). Pat responded to the email from the seller's broker: "Buyer is out of town right now. Is there any where that you can give time to get back in town to get you the update [proof of funds]?"

January 17    At 8:52 a.m., the seller's broker emailed Pat: "Please advise on the updated [proof of funds] and extension. If it is not in today the seller

4

are[sic] going to move on & your offer will be rejected." Pat responded at 9:02 a.m.: "Buyer accepts the extension on the closing date and getting the update[d] [proof of funds], but he will not be back in town until tomorrow." At 9:36 a.m., the seller's broker responded: "Seller is moving on. Please advise we need by end of business today." At 10:17 a.m., Pat replied: "We did all we can, but the Buyer will not be in town until tomorrow. He is banking with small bank and cannot find one where he is right now. He can get you the [proof of funds] tomorrow. If the Seller wants to move on, there is nothing we can do. If that is what the Seller wants to do, should I call the attorney's office to let them know the contract is being rejected?" Razavi averred that he faxed Pat an updated proof of funds at approximately 11:00 a.m.,[2] but that he did not receive any communication from her and was not told about the close of business day "'drop dead' e-mail from the Seller's agent." At 3:02 p.m., the seller's broker emailed Pat: "Your offer has been rejected.

---

[2]In his deposition, however, Razavi stated that he faxed or emailed it to Pat, "Either it was on the 17th. Sometime[ ] around, you know, that timeframe," but later admitted, "I believe she didn't receive it because what happened was probably I faxed it and also I took a picture of it on my iPhone and I resend[sic] it to her, you know, again."

Property is going back on the market. Sorry we couldn't make this work." At 4:49 p.m., Pat emailed the seller's broker: "Is the property back on the market today? My Buyer wants to present another offer with an update[d] proof of funds tomorrow." The seller's broker responded minutes later: "You can resubmit an offer, but not until I have the updated proof of funds."

January 18   Razavi provided Pat with an updated proof of funds and Pat submitted another offer to purchase the property.

January 19   At 8:56 a.m., the seller's broker informed Pat that the seller had already accepted another offer. At 12:06 p.m., Pat forwarded to Razavi the January 17 email from the seller's broker informing her of the end of day deadline, with a message to Razavi, "Here you go!"

Razavi averred that had he been informed of the "January 17 'drop dead' close of business deadline," he "would have easily been able to comply with this deadline and provide an updated proof of funds to Pat." He stated further that he had an updated proof of funds in his possession on January 17 and "could have easily re-sent it," but he believed that he had an "'accepted'" contract and that we were "'good to go'."

6

Under Georgia law, the relationship between real estate brokers and potential buyers of real estate is governed by the Brokerage Relationships in Real Estate Transactions Act ("BRRETA"). OCGA § 10-6A-1, et seq. The intent of BRRETA, as declared by the Georgia legislature, is to provide codification of the relationships between real estate brokers and consumers of brokerage services in order to prevent detrimental misunderstandings and misinterpretations of such relationships by both consumers and real estate brokers and thus promote and provide stability in the real estate market. OCGA § 10-6A-2 (a). In this regard, BRRETA provides that, absent a written, signed agreement to the contrary, the duties and obligations imposed upon a real estate broker who performs brokerage services are limited to those set forth in the statute. OCGA § 10-6A-4 (a). More specifically, it provides that "[a] broker shall not be deemed to have a fiduciary relationship with any party or fiduciary obligations to any party *but shall only be responsible for exercising reasonable care in the discharge of its specified duties as provided in this chapter* and, in the case of a client, as specified in the brokerage engagement."

(Punctuation and footnote omitted; emphasis supplied.) *Harrouk v. Fierman*, 291 Ga. App. 818, 820 (1) (662 SE2d 892) (2008). Because there was no written agreement between RZI and Pat, RZI was Pat's "customer" as defined in OCGA § 10-6A-3 (8): "'Customer' means a person who is not being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement but for whom a broker may

7

perform ministerial acts in a real estate transaction pursuant to either a verbal or written agreement." And Pat was therefore a "transaction broker" as defined in OCGA § 10-6A-3 (14):

> a broker who has not entered into a client relationship with any of the parties to a particular real estate transaction and who performs only ministerial acts on behalf of one or more of the parties, but who is paid valuable consideration by one or more parties to the transaction pursuant to a verbal or written agreement for performing brokerage services.

The term "ministerial acts" is defined as "those acts described in Code Section 10-6A-14 and such other acts which do not require the exercise of the broker's or the broker's affiliated licensee's professional judgment or skill." OCGA § 10-6A-3 (12). Examples of ministerial acts that are "include[]d without limitation" are set forth in OCGA § 10-6A-14 (a). And subsection (b) provides a list of the mandatory duties of a transactional broker.[3] While not specifically enumerated among the examples of ministerial acts listed in subsection (a), RZI's claim here, that Pat failed to timely communicate vital information concerning the status of its offer to purchase the property, is an act that did not require the exercise of Pat's professional judgment or

---

[3]We note that this list provides that the broker shall perform duties timely: "timely present all offers," "timely account for all money," and "timely disclose" certain facts. OCGA § 10-6A-14 (b).

8

skill. Under this statutory framework then, we are required to determine if a genuine issue of facts exists regarding whether Pat exercised reasonable care in the discharge of a ministerial duty. See OCGA § 10-6A-4 (a).

RZI argues that it suffered damages due to Pat's breach of the duty of reasonable care. It contends that it was Pat who caused the late delivery of the updated proof of funds. RZI asserts that not only did Pat fail to timely present the updated proof of funds, she also failed to send the earnest money to seller's broker as requested, led RZI to believe that contract was "'accepted'" and "'everything was good,'" did not inform RZI of the final ultimatum until two days after it had expired, and sent an unauthorized response acquiescing in the seller "mov[ing] on."

While RZI presents argument regarding various actions or inactions of Pat that it believes resulted in the rejection of its offer, the undisputed facts show that the seller rejected the offer because RZI failed to timely submit an updated proof of funds. The only *material* issue of fact, then, is whether the failure to do so was due to Pat's failure to exercise reasonable care in timely disclosing the final deadline for submission of the proof of funds. In this regard, Razavi averred that Pat did not promptly inform him of the January 13th, 10 a.m. deadline "with a simple telephone call," instead sending him an email that he did not receive until the next day, and that

9

she also failed to call him about the "January 17 'drop dead' close of business deadline." His deposition testimony establishes that he did have a telephone conversation with Pat at sometime *after* the 3:02 p.m. rejection of RZI's offer on January 17: "I had to hurry up . . . get back to Atlanta and then I believe in the meanwhile she was telling me that the seller . . . backed out of the deal . . . I was coming to get the updated proof of funds so I can go ahead and give it to [Pat] . . . either I e-mailed it or . . . faxed it." And Pat deposed that she exchanged text messages with Razavi informing him that his offer was rejected on January 17, and that he told her he wanted to make another offer but "he couldn't get the proof of funds to me right away so we had to wait."

So while there is evidence that, on January 17, Pat communicated to Razavi that the seller had rejected his offer, there is no evidence that she informed him that the seller's broker had again extended the deadline for submitting of the updated proof of funds to the close of business that day.[4] Pat deposed, however, that if anything was urgent, she would contact Razavi by telephone. The record before us

---

[4]The trial court found in its order that the seller's "agent informed Pat via email that RZI's offer had been rejected and the Property was going back on the market, and Pat forwarded that email to Razavi the same day," but the record does not support the finding that she forwarded the email.

therefore shows that a genuine issue of material fact remains regarding whether Pat exercised reasonable care in the discharge of the ministerial duty of timely informing Razavi of the deadlines set by the seller. Specifically, a question of fact exists as to whether she timely informed Razavi of the January 13 deadline, and whether she notified him at all that the seller had given him yet another deadline on January 17 to submit the updated proof of funds. See, e. g., *Davis v. Silvers*, 295 Ga. App. 103, 106-107 (670 SE2d 805) (2008) (issue of fact whether broker breached duty to disclose adverse material facts affecting property); *Ikola v. Schoene*, 264 Ga. App. 338, 341-342 (1) (590 SE2d 750) (2003) (same).

The trial court therefore erred in granting REO's motion for summary judgment.[5]

*Judgment reversed. Doyle, C. J. and Phipps, P. J., concur.*

---

[5]We do not address whether RZI failed to show damages as the trial court's order shows that it made no ruling on the post-discovery evidence presented on the issue.